63 F.3d 652
 41 ERC 1705, 64 USLW 2139, 25 Envtl.
L. Rep. 21,473
 NATIONAL SOLID WASTES MANAGEMENT ASSOCIATION, Valley
Sanitation Company, Inc., Land Reclamation Company
and Waste Management of Wisconsin, Inc.,
Plaintiffs-Appellants,
v.
George MEYER, in his official capacity as Secretary of the
Wisconsin Department of Natural Resources,
Defendant-Appellee.
 Nos. 94-4006, 95-1058.
 United States Court of Appeals,
Seventh Circuit.
 Argued March 28, 1995.
Decided Aug. 23, 1995.
Rehearing and Suggestion for Rehearing En Banc Denied Sept.
20, 1995.
 
 Andrew J. Pincus (argued), Evan M. Tager, Laurie R. Rubenstein, Mayer, Brown & Platt, Washington, DC, Ann Ustad Smith, Arvid A. Sather, Michael, Best & Friedrich, Madison, WI, Dennis M. Wilt, Waste Management, Inc., Westchester, IL, Bruce Parker, Environmental Industry Associations, Washington, DC, for National Solid Wastes Management Ass'n, Valley Sanitation Co., Inc., Land Reclamation Co., Waste Management of Wisconsin, Inc.
 Frank D. Remington, Asst. Atty. Gen., Office of the Atty. Gen., Wisconsin Dept. of Justice, Madison, WI, JoAnne F. Kloppenburg (argued), Wisconsin Dept. of Justice, Madison, WI, for George Meyer.
 Before BAUER, EASTERBROOK and RIPPLE, Circuit Judges.
 RIPPLE, Circuit Judge.
 
 
 1
 In this appeal, a solid waste trade association and several Wisconsin landfill operators bring a Commerce Clause challenge against a Wisconsin statute. The statute forbids waste generators from using the State's landfills unless they generate waste in a region that has adopted an "effective recycling program," as defined by Wisconsin law. The district court, while striking down other sections of the statute, upheld the sections under review here. It reasoned that these sections did not discriminate against interstate commerce and that the local benefits outweighed the burdens imposed on interstate commerce. For the reasons that follow, we reverse and remand for further proceedings.
 
 
 2
 * BACKGROUND
 
 A. Facts
 
 3
 Over the last decade, fewer and fewer solid waste landfills have remained available in Wisconsin to dispose of a steadily increasing amount of waste. In response to this situation, Wisconsin enacted legislation designed to manage the flow of solid waste into its landfills. In relevant part, the statute bars individuals from disposing of eleven specifically enumerated recyclable materials in the State's solid waste landfills. Wis.Stat. Sec. 159.07(3).[1] Thus, waste containing any of these items may not be dumped in the State.
 
 
 4
 The statute recognizes, however, an exception to this general prohibition. Under the exception, both in-state and out-of-state generators of solid, non-medical waste may send waste that contains quantities of the banned items to Wisconsin landfills if the waste is generated "in a region that has an effective recycling program as determined under [Wis.Stat.] Sec. 159.11." See Wis.Stat. Sec. 159.07(7)(a).[2] Section 159.11 of the statute initially provides that all such programs, whether for communities within Wisconsin or beyond its borders, are subject to approval by the Wisconsin Department of Natural Resources. Id. Sec. 159.11(1). The statute then outlines the requirements of the "effective recycling program." First, each program must contain a "public education component" detailing reasons and opportunities for recycling, as well as prohibitions on dumping the eleven items referred to above. Id. Sec. 159.11(2)(a). Effective recycling programs also must mandate that all of the community's single-family residences and commercial, retail, industrial, and governmental facilities engage in waste-reducing behaviors. Specifically, the statute mandates that these entities either separate the eleven listed materials from their waste or ensure that the waste is treated at a facility that will recover the materials prior to disposal. See id. Sec. 159.11(2)(b). In addition, all owners of residential buildings containing five or more units, as well as owners of commercial, retail, industrial, and governmental facilities, must provide recycling containers for the occupants of the facility, must ensure that recyclables generated at the site are collected, and must regularly notify occupants of available recycling programs, unless waste from the site is treated at a materials recovery facility. See id. Sec. 159.11(2)(c), (d). These requirements apply to all waste generators and facility owners in the community, irrespective of whether they, or, in the case of facilities, their occupants, actually dump waste in Wisconsin.
 
 
 5
 Enacting communities must meet several additional requirements. For example, the effective recycling program must establish systems for collecting separated recyclable materials from the region's single-family residences, id. Sec. 159.11(e), as well as for processing and marketing the recyclables the community collects, id. Sec. 159.11(em). The community must prohibit the disposal, in either a solid waste disposal or treatment facility, of any of the eleven listed items that have been separated for recycling. Id. Sec. 159.11(2)(er). In addition, communities must adhere to any additional rules promulgated by the Wisconsin Department of Natural Resources. Id. Sec. 159.11(2)(f). Every community also must provide for "[a]dequate enforcement" of the programs established under the statute, id. Sec. 159.11(2)(g), acquire all the equipment necessary to implement those programs, id. Sec. 159.11(2)(h), and make a "reasonable effort" to reduce the "amount, by weight" of the eleven listed materials generated as solid waste in the region, id. Sec. 159.11(2)(i). With respect to non-Wisconsin communities, the statute mandates that they comply with any recycling laws of their home state as well as with the requirements of the Wisconsin statute. Id. Sec. 159.11(2e)(a). The statute directs the Wisconsin Department of Natural Resources to promulgate rules for comparing the programs of non-Wisconsin municipalities to Wisconsin municipalities or counties. See id. Sec. 159.09(1). Areas of comparison must include the level of financing, enforcement mechanisms and effort, and the number of materials being separated and recycled. Id. Sec. 159.11(2e)(b).
 
 
 6
 The most significant feature of the Wisconsin statute, for purposes of this case, is the requirement, discussed above, that all citizens in the effective recycling community must observe the statute's recycling provisions, whether or not they actually dump waste in Wisconsin. See id. 159.11(2)(b), (c), (d); see also id. Sec. 159.11(2)(g) (obligating communities to establish effective enforcement provisions). With respect to out-of-state communities, the statute thus obligates every waste generator in a community with an effective recycling program to adhere to Wisconsin's standards, either by separating out recyclable materials or by sending waste to a materials recovery facility, even if their waste is intended for dumps in Illinois, Minnesota, or Iowa. Everyone in the community either must separate recyclables or must use a materials recovery facility in order for anyone to receive access to Wisconsin's landfills.
 
 B. Earlier Proceedings
 
 7
 Appellants National Solid Wastes Management Association, Valley Sanitation Co., Land Reclamation Co., and Waste Management of Wisconsin, Inc. ("NSWM"),[3] challenged the Wisconsin solid waste legislation under the Commerce Clause and 42 U.S.C. Sec. 1983. The district court accepted NSWM's argument in part, and held unconstitutional two portions of the legislation, R.61 at 14-16; Wisconsin has not appealed that decision. The district court held infirm the statute's "formal rulemaking" and "effective siting" requirements. The former provision mandated that the Wisconsin Department of Natural Resources approve non-Wisconsin communities' effective recycling programs via formal rulemaking. Wis.Stat. Sec. 159.11(1) (1993). No such requirement applied to in-state communities. The latter provision barred Wisconsin landfills from accepting solid waste from any state unless the amount of new solid waste disposal capacity sited in that state during the past four years exceeded the amount of waste the state generated during that period. Id. Sec. 159.12(3).
 
 
 8
 The district court rejected, however, NSWM's claim that Wisconsin's "effective recycling program" requirement violated the Commerce Clause. The court determined that the requirement was neither facially discriminatory, nor discriminatory in practical effect. Therefore, it evaluated the statute under the balancing test the Supreme Court set forth in Pike v. Bruce Church, Inc., 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). Because factual disputes existed concerning "the extent of the burden imposed upon out-of-state communities," the district court declined to grant either party summary judgment. R.61 at 13.
 
 
 9
 Following a bench trial, the court ruled in favor of the State. It concluded that the Wisconsin statute's "sole burden on commerce is the requirement that out-of-state municipalities would be required to recycle all waste, 80 percent of which will not be sent to Wisconsin landfills." Tr. III at 230. The court reasoned, however, that "the cost to change [to a Wisconsin-approved recycling program]" and "the administrative burden" of compliance "would be limited." Id. at 234-35. Next, it found that the statute would provide several local benefits, particularly the conservation of landfill capacity and the protection of the environment. The court concluded that the statute's putative local benefits outweighed its "small burden on interstate commerce," id. at 238, and dismissed NSWM's remaining claims with prejudice.
 
 II
 DISCUSSION
 
 10
 Our standard of review following a bench trial in the district court is well established. We review the district court's factual findings for clear error. Fed.R.Civ.P. 52(a); Thornton v. Brown, 47 F.3d 194, 196 (7th Cir.1995); see Maine v. Taylor, 477 U.S. 131, 144-45, 106 S.Ct. 2440, 2450, 91 L.Ed.2d 110 (1986) (applying standard in Commerce Clause context) (citing Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)). We review the district court's legal conclusions, including its determination that the Wisconsin statute did not discriminate against interstate commerce, de novo. Market St. Assocs. Ltd. Partnership v. Frey, 21 F.3d 782, 785 (7th Cir.1994); cf. Government Suppliers Consolidating Servs., Inc. v. Bayh, 975 F.2d 1267, 1278-83 (7th Cir.1992) (reviewing Commerce Clause challenge to state municipal solid waste statute), cert. denied, --- U.S. ----, 113 S.Ct. 977, 122 L.Ed.2d 131 (1993).
 
 
 11
 NSWM submits that the Wisconsin statute violates the Commerce Clause per se because it regulates commerce occurring wholly outside Wisconsin. It notes that the statute conditions dumping access on the observance of an "effective recycling program" by all residents of a municipality, whether or not they actually dump waste in Wisconsin. NSWM also submits that the statute should receive strict scrutiny because it treats similar products differently depending upon their point of origin. It argues that the statute does not survive strict scrutiny because Wisconsin may serve adequately its goals of preserving dwindling landfill space and protecting the environment through reasonable non-discriminatory alternatives.[4] Alternatively, NSWM claims that the Wisconsin program fails the Pike test because its burden on interstate commerce is significant. Finally, it submits that the district court erred in dismissing its Sec. 1983 claims even though the court found two provisions of the Wisconsin statute unconstitutional.
 
 A. Commerce Clause
 1.
 
 12
 The Commerce Clause grants Congress the power "[t]o regulate Commerce ... among the several states." U.S. Const. art. I, Sec. 8, cl. 3. Although this language does not expressly limit the states' ability to interfere with interstate commerce, the Supreme Court consistently has held that the Clause contains a further negative command, known as the "dormant Commerce Clause," which "prohibits States from taking certain actions respecting interstate commerce even absent congressional action." CTS Corp. v. Dynamics Corp. of Am., 481 U.S. 69, 87, 107 S.Ct. 1637, 1648, 95 L.Ed.2d 67 (1987); see also Oregon Waste Sys. v. Department of Envtl. Quality, --- U.S. ----, ----, 114 S.Ct. 1345, 1349, 128 L.Ed.2d 13 (1994); Alliance for Clean Coal v. Miller, 44 F.3d 591, 595 (7th Cir.1995). In essence, "[t]he 'negative' or 'dormant' aspect of the Commerce Clause prohibits States from advancing their own commercial interests by curtailing the movement of articles of commerce, either into or out of the state." Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Natural Resources, 504 U.S. 353, 359, 112 S.Ct. 2019, 2023, 119 L.Ed.2d 139 (1992) (quotation and citation omitted). The dormant Commerce Clause applies with full force to state regulation of the collection, transportation, processing, and disposal of solid waste.[5]
 
 
 13
 The Supreme Court has adopted what amounts to a two-tiered approach to analyzing state economic regulation under the Commerce Clause. Brown-Forman Distillers Corp. v. New York State Liquor Auth., 476 U.S. 573, 578-79, 106 S.Ct. 2080, 2084, 90 L.Ed.2d 552 (1986).[6] When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, the Court generally has "struck down the statute without further inquiry." Brown-Forman Distillers Corp., 476 U.S. at 579, 106 S.Ct. at 2084 (citations omitted).[7] When, however, a state statute is neutral on its face, has only indirect or incidental effects on interstate commerce, and regulates evenhandedly, it is analyzed under a second test. See C & A Carbone, Inc. v. Town of Clarkstown, --- U.S. ----, ----, 114 S.Ct. 1677, 1682, 128 L.Ed.2d 399 (1994); Brown-Forman Distillers Corp., 476 U.S. at 579, 106 S.Ct. at 2084. Under this approach, the state statute will be upheld "unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). The Supreme Court also has noted that "there is no clear line" separating the category of state regulation that is virtually per se invalid and the category subject to the Pike test. Brown-Forman Distillers Corp., 476 U.S. at 579, 106 S.Ct. at 2084; cf. National Paint & Coatings Ass'n v. City of Chicago, 45 F.3d 1124, 1131 (7th Cir.) (treating cases involving facially discriminatory statutes and those involving statutes with "powerful" discriminatory effects as separate categories subject to the same rigorous scrutiny), cert. denied, --- U.S. ----, 115 S.Ct. 2579, 132 L.Ed.2d 829 (1995). The "critical consideration" in determining the appropriate degree of scrutiny is the "overall effect of the statute on both local and interstate activity." Brown-Forman Distillers Corp., 476 U.S. at 579, 106 S.Ct. at 2084; Government Suppliers Consolidating Servs., Inc., 975 F.2d at 1277. Having set forth the governing principles, we now consider whether Wisconsin's solid waste legislation runs afoul of the Commerce Clause.
 
 B. The Wisconsin Statute
 1.
 
 14
 The Wisconsin statute provides that both in-state and out-of-state waste generators are barred from dumping listed materials in Wisconsin landfills unless they reside in a community that has adopted an "effective recycling program." Wis.Stat. Sec. 159.07(7)(a); see also id. Sec. 159.07(3); Sec. 159.11. Focusing upon this universal requirement, the district court reasoned that the Wisconsin statute did not merit heightened scrutiny because it was neither facially discriminatory nor discriminatory in practical effect. We find ourselves in respectful disagreement with the district court's conclusion. As we held in Government Suppliers Consolidating Services, Inc., the " 'critical consideration is the overall effect of the statute on both local and interstate activity.' " 975 F.2d at 1278 (quoting Brown-Forman Distillers Corp., 476 U.S. at 573, 106 S.Ct. at 2081). When considering the purpose of the challenged statute, we are not bound by the description given it by the legislature; it is our duty to determine the practical effect of the law. Id.
 
 
 15
 Wisconsin's solid waste legislation conditions the use of Wisconsin landfills by non-Wisconsin waste generators on their home communities' adoption and enforcement of Wisconsin recycling standards; all persons in that non-Wisconsin community must adhere to the Wisconsin standards whether or not they dump their waste in Wisconsin. If the out-of-state community does not conform to the Wisconsin way of doing things, no waste generator in that community may utilize a Wisconsin disposal site. See Wis.Stat. Sec. 159.11(2)(b). The practical impact of the Wisconsin statute on economic activity completely outside the State reveals its basic infirmity: It essentially controls the conduct of those engaged in commerce occurring wholly outside the State of Wisconsin and therefore directly regulates interstate commerce. In Healy v. Beer Institute, 491 U.S. 324, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989), the Supreme Court, through the pen of Justice Blackmun, noted that "a state law that has the 'practical effect' of regulating commerce occurring wholly outside that State's borders is invalid under the Commerce Clause." Id. at 332, 109 S.Ct. at 2497. The Court later elaborated:
 
 
 16
 First, the Commerce Clause precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State, and, specifically, a State may not adopt legislation that has the practical effect of establishing a scale of prices for use in other states[.] Second, a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature. The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State. Third, the practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation.
 
 
 17
 Id. at 336, 109 S.Ct. at 2499 (internal quotations and citations omitted).
 
 
 18
 Healy is consistent with a long line of cases that considered whether state laws violated the Commerce Clause by regulating or controlling commerce occurring wholly outside the legislating state.[8] These cases make clear that the Court will not hesitate to strike down a state law shown to have extraterritorial scope and an adverse impact on commerce occurring wholly outside the enacting state. For example, in Healy, the challenged Connecticut statute required out-of-state shippers of beer to agree that the prices they charged Connecticut wholesalers would be no higher than the prices charged the previous month in any state bordering Connecticut. See id. at 327, 109 S.Ct. at 2494. In Brown-Forman Distillers Corp., the challenged New York statute similarly required liquor distillers to agree that they would charge New York wholesalers a price no higher than the lowest price charged to any other wholesaler in the United States. See 476 U.S. at 576, 106 S.Ct. at 2082. The Supreme Court reasoned that each statute violated the Commerce Clause because it "require[d] out-of-state shippers to forgo the implementation of competitive-pricing schemes in out-of-state markets because those pricing decisions [were] imported by statute into the [enacting state's] market regardless of local competitive conditions." Healy, 491 U.S. at 339, 109 S.Ct. at 2501; see also Brown-Forman Distillers Corp., 476 U.S. at 583-84, 106 S.Ct. at 2087; cf. Baldwin v. G.A.F. Seelig, Inc., 294 U.S. 511, 520-25, 55 S.Ct. 497, 499-501, 79 L.Ed. 1032 (1935) (striking down New York statute that required out-of-state milk to be sold at prices no less than those set by statute for milk produced in New York; the statute eliminated the competitive advantage enjoyed by milk producers in neighboring Vermont). Likewise, in Edgar v. MITE Corp., 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), the Court reviewed an Illinois law that required any takeover offer for shares of a "target company" to be registered with the Illinois Secretary of State. See id. at 626-27, 102 S.Ct. at 2632. The statute defined "target company" as any company in which Illinois shareholders owned ten percent of the securities subject to the takeover offer, or any company that met two of the following criteria: It was organized under Illinois law; its principal place of business was in Illinois; or, it had at least ten percent of its stated capital and paid-in surplus in Illinois. See id. at 627, 102 S.Ct. at 2632-33. The statute gave the Illinois Secretary of State the authority to hold hearings concerning the fairness of the offer, as well as the power to deny registration to any tender offer that, in his opinion, either failed to provide full disclosure of material information or was inequitable. See id. A plurality of the Court reasoned that the Illinois law was infirm because of its "sweeping extraterritorial effect":
 
 
 19
 [T]he Illinois law, unless complied with, sought to prevent MITE [a Delaware corporation with principal offices in Connecticut] from making its offer and concluding interstate transactions not only with [the target's] stockholders living in Illinois, but also with those living in other States and having no connection with Illinois. Indeed, the Illinois law on its face would apply even if not a single one of [target's] shareholders were a resident of Illinois.... Thus the Act could be applied to regulate a tender offer which would not affect a single Illinois shareholder.
 
 
 20
 Id. at 642, 102 S.Ct. at 2640 (plurality op.). Healy, Brown-Forman Distillers Corp., and MITE Corp. thus establish that the Commerce Clause constrains a state from projecting its economic legislation onto commerce wholly occurring in its sister states. Cf. K-S Pharmacies, Inc. v. American Home Products Corp., 962 F.2d 728, 730 (7th Cir.1992) ("No state may require sellers to charge the same price within its borders as they charge elsewhere.").
 
 
 21
 Although cases like Healy and Brown-Forman Distillers Corp. involved price affirmation statutes, the principles set forth in these decisions are not limited to that context. Healy itself discusses the general principle that "the Commerce Clause precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State," and then refers to the more "specific[ ]" application of that principle, that "a State may not adopt legislation that has the practical effect of establishing a scale of prices for use in other states[.]" See Healy, 491 U.S. at 336, 109 S.Ct. at 2499 (quotation and citation omitted). The breadth of the principle is demonstrated by its use by the plurality in MITE Corp. Indeed, only recently the Court has commented, in a case involving state regulation of solid waste processing, that "States and localities may not attach restrictions to exports or imports in order to control commerce in other states." C & A Carbone, Inc., --- U.S. at ----, 114 S.Ct. at 1683 (citing Baldwin v. G.A.F. Seelig, Inc., 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935)).
 
 
 22
 The prohibition against direct regulation of interstate commerce by the states has been applied consistently by the circuits. In NCAA v. Miller, 10 F.3d 633 (9th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1543, 128 L.Ed.2d 195 (1994), the Court of Appeals for the Ninth Circuit held that a Nevada statute that required different procedures in Nevada collegiate athletic association enforcement proceedings than those employed by the NCAA in other states violated the Commerce Clause because it regulated directly interstate commerce. Noting that the NCAA could operate only with uniform procedures in its enforcement proceedings, the court held that the practical effect of the Nevada statute was to require the NCAA to conduct all of its proceedings under the Nevada requirements. "The Statute would force the NCAA to regulate the integrity of its product in every state according to Nevada's procedural rules.... In this way, the Statute could control the regulation of the integrity of a product in interstate commerce that occurs wholly outside Nevada's borders." Id. at 639, Moreover, noted the court, Nevada is not the only state that has enacted or could enact legislation that establishes rules for NCAA proceedings. "The serious risk of inconsistent obligations wrought by the extraterritorial effect of the Statute demonstrates why it constitutes a per se violation of the Commerce Clause." Id. at 640.[9]
 
 
 23
 We are not the first circuit to be confronted with the problem of extraterritoriality in the context of waste regulation. Our colleagues in the Tenth Circuit confronted a similar situation in Hardage v. Atkins, 619 F.2d 871 (10th Cir.1980). In that case, the court considered an Oklahoma statute similar to Wisconsin's solid waste legislation. In relevant part, the Oklahoma law prohibited out-of-state hazardous waste generators from shipping their waste to Oklahoma disposal facilities unless their home state had adopted "substantially similar standards for controlled industrial waste disposal as those which Oklahoma ha[d] enacted." Id. at 873. The court concluded that the statute violated the Commerce Clause:
 
 
 24
 [Oklahoma's law] imposes an economic embargo on all incoming shipments, unless and until the state of origin enacts a law prescribing standards which are substantially similar to those of Oklahoma. It thus reaches out and seeks to force the enactment in the state of origin of a statute with standards similar to Oklahoma['s] ... Oklahoma is forcing its judgment with respect to hazardous wastes on its sister states at the pain of an absolute ban on the interstate flow of commerce. As we view the situation, Oklahoma cannot use the threat of economic isolation as a weapon to force other states to enact substantially similar legislation any more than Oklahoma can impose a reciprocity agreement against a sister state. Thus, the mandatory nature of the device or implement is the objectionable part.
 
 
 25
 Id. (quotations and internal citations omitted).
 
 
 26
 We believe that the Tenth Circuit has characterized the situation fairly and accurately. Like the Oklahoma statute in Hardage, the Wisconsin statute seeks to force Wisconsin's judgment with respect to solid waste recycling on communities in its sister states "at the pain of an absolute ban on the flow of interstate commerce." See Baldwin, 294 U.S. at 524, 55 S.Ct. at 501 ("One state may not put pressure ... upon others to reform their economic standards. If farmers or manufacturers in Vermont are abandoning farms or factories, or are failing to maintain them properly, the legislature of Vermont and not that of New York must supply the fitting remedy."); cf. New Energy Co. v. Limbach, 486 U.S. 269, 274-76, 108 S.Ct. 1803, 1808-09, 100 L.Ed.2d 302 (1988) (holding that Ohio law which denied favorable tax treatment to out-of-state ethanol producers unless their states of origin afforded similar treatment to Ohio producers discriminated against interstate commerce); Great Atl. & Pac. Tea Co. v. Cottrell, 424 U.S. 366, 375-81, 96 S.Ct. 923, 930-32, 47 L.Ed.2d 55 (1976) (striking down a reciprocity agreement with respect to sale of milk as discriminatory against interstate commerce). The practical effect of the Wisconsin legislation is to impose the requirements of Wisconsin law on numerous waste generators who neither reside, nor dispose of their waste in Wisconsin; eighty percent of the out-of-state waste subject to this legislation is destined for non-Wisconsin landfills. Out-of-state waste generators who do not dump in Wisconsin but who are located in communities adhering to Wisconsin's "effective recycling program" must therefore bear the costs of complying with the Wisconsin law while their competitors in non-effective recycling communities, who may be dumping solid waste at the very same non-Wisconsin landfill, do not. The Wisconsin statute reaches across the Wisconsin state line and regulates commerce occurring wholly outside Wisconsin. As a price for access to the Wisconsin market, it attempts to assume control of the integrity of the product that is moving in interstate commerce. Wisconsin's approach to sound solid waste management, and no one else's, must govern, even when the product will never cross its borders. The Commerce Clause contemplates a very different market among the states of the Union.
 
 
 27
 This situation is analogous to the one that confronted the Supreme Court in American Trucking Ass'ns, Inc. v. Scheiner, 483 U.S. 266, 107 S.Ct. 2829, 97 L.Ed.2d 226 (1987). There, the Court was confronted with an unapportioned flat tax on interstate motor vehicles. The Court held that the tax violated the Commerce Clause because it failed the "internal consistency test." The state tax, if imposed by every state, would certainly have placed a burden on the interstate hauler and impeded the flow of interstate commerce. Cf. Oklahoma Tax Comm'n v. Jefferson Lines, --- U.S. ----, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995) (holding that a sales tax on a bus ticket sold within the state did not violate the dormant Commerce Clause; the tax's identical application by all states would not result in a disadvantage to interstate commerce because each sale would result in one tax).
 
 2.
 
 28
 Although we have characterized the Wisconsin statute as impermissibly regulating directly interstate commerce, we note that the practical effect of the statute could also be analyzed as working a discrimination on interstate commerce. Because Wisconsin's effective recycling program legislation "discriminate[s] in practical effect against interstate commerce, [it is] subject to the higher level of scrutiny," and the State is required to demonstrate that its concerns "cannot be adequately served by nondiscriminatory alternatives." Government Suppliers Consolidating Servs., Inc., 975 F.2d at 1279 (quotation and citation omitted); see Fort Gratiot Sanitary Landfill, Inc., 504 U.S. at 359, 112 S.Ct. at 2023; Taylor, 477 U.S. at 138, 106 S.Ct. at 2447.[10] The Wisconsin statute creates an embargo on waste from a hauler from another state, or a community within that state, unless that political entity has decided to adopt the Wisconsin view of environmental management. No matter what the alternate approaches to recycling may offer in terms of environmental benefits and costs, a waste generator/hauler can pass the Wisconsin border only if its community has opted for the Wisconsin plan. Similarly, the Wisconsin disposal site is deprived of the waste from out-of-state not because it is more noxious than waste produced the Wisconsin way, but simply because it comes from a community whose ways are not Wisconsin's ways. Moreover, the Wisconsin statute places the participant in interstate commerce in a difficult situation with respect to its participation in interstate commerce with other states. As we have noted earlier, if Wisconsin can insist on interstate haulers doing things the Wisconsin way in order to obtain access to the Wisconsin market, other states can insist on similar or different prerequisites to their markets.
 
 
 29
 Wisconsin submits that it has no alternative means of ensuring that recyclables are eliminated from waste entering Wisconsin other than to require that non-Wisconsin municipalities require that all of their residents adhere to the Wisconsin-mandated recycling program even if the waste is not destined for Wisconsin. Adherence to the program some of the time, i.e., when the waste is actually sent to Wisconsin, creates, the State argues, an impossible enforcement situation. We cannot accept this argument. The solid waste legislation itself makes clear that there is an available, less discriminatory alternative that could serve the State's purpose just as well as the requirement that the entire community follow the dictates of Wisconsin's plan. Specifically, the Wisconsin statute makes clear that, if the waste is processed by a materials recovery facility that separates the eleven listed materials, the waste will conform to the environmental needs of Wisconsin. Accordingly, Wisconsin could realize its goals of conserving landfill space and protecting the environment by mandating that all waste entering the State first be treated at a materials recovery facility with the capacity to effect this separation. Given the existence of such a nondiscriminatory alternative that serves adequately Wisconsin's legitimate concerns, the discriminatory legislation cannot be justified. Cf. Taylor, 477 U.S. at 151-52, 106 S.Ct. at 2454 (upholding state law banning importation of live baitfish because available inspection techniques could not adequately serve state's legitimate purpose of preventing native species from being exposed to parasites).[11]3.
 
 
 30
 Given the nondiscriminatory and less burdensome methods that could be implemented to ensure the segregation of recyclable materials before the waste is committed to a Wisconsin landfill, we also note that, if it were necessary to reach the issue (or if our earlier characterizations of the Wisconsin scheme as discriminatory and a direct regulation of interstate commerce were found to be erroneous), the Wisconsin scheme still could not pass muster under the test of Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). Under that approach, even when a state statute regulates interstate commerce indirectly and non-discriminatorily, the burden imposed on that commerce must "not be excessive in relation to the local interests served by the statute." MITE Corp., 457 U.S. at 643, 102 S.Ct. at 2641. The need of Wisconsin to execute a sound and vigorous environmental policy is indeed substantial, but, as we have noted above, it has certainly not demonstrated in this litigation that it must pursue it in the way that it has. The State has no legitimate interest in requiring that out-of-state generators conform to the Wisconsin plan when those entities are not going to transport the waste to Wisconsin. As we have just noted, Wisconsin has other means to protect its legitimate environmental interests. On the other hand, the burden on the out-of-state generator is substantial. The interstate generator and hauler must abide by Wisconsin rules even if the product is not bound for that State, if there are conflicting regulations in other jurisdictions, or if there is a more efficient and cost-effective method of transporting the waste. Accordingly, we conclude that the Wisconsin plan imposes a very significant burden on interstate commerce, a burden that far outweighs the permissible benefits that Wisconsin, as a member of the federal union, has a right to expect.
 
 Conclusion
 
 31
 For the foregoing reasons, the judgment of the district court is reversed and the case remanded for further proceedings consistent with this opinion.
 
 REVERSED and REMANDED
 
 
 [1]
 The statute provides, in relevant part:
 Beginning on January 1, 1995, no person may dispose of in a solid waste disposal facility or burn without energy recovery in a solid waste treatment facility in this state any of the following:
 (a) An aluminum container.
 (b) Corrugated paper or other container board.
 (c) Foam polystyrene packaging.
 (d) A glass container.
 (e) A magazine or other material printed on similar paper.
 (f) A newspaper or other material printed on newsprint.
 (g) Office paper.
 (h) A plastic container.
 (i) A steel container.
 (j) A waste tire, as defined in Sec. 84.078(1)(b).
 (k) A container for carbonated or malt beverages that is primarily made of a combination of steel and aluminum.
 Wis.Stat. Sec. 159.07(3).
 
 
 [2]
 At the time this lawsuit was filed, Sec. 159.07(7) provided, in pertinent part:
 The prohibitions in [Sec. 159.07(3) ] do not apply with respect to solid waste, except medical waste ... that is generated in a region that has an effective recycling program, as determined under Sec. 159.11, and, if the region is not in this state, the region is located in a state that has an effective siting program, as determined under Sec. 159.12.
 Wis.Stat. Sec. 159.07(7)(a). As we note later, the district court struck down the "effective siting" portion of the statute on the ground that it was facially discriminatory and lacked sufficient justification.
 
 
 [3]
 NSWM is a not-for-profit solid waste management trade association. The other three plaintiff-appellants are owners and operators of Wisconsin landfills that accepted out-of-state waste in 1993. They collectively will be referred to as "NSWM."
 
 
 [4]
 For example, NSWM notes, the State could narrow the scope of its law to apply only to individuals who dispose of waste in Wisconsin. Wisconsin could also require those who haul waste into the State to ensure that their customers comply with Wisconsin's mandates. Moreover, Wisconsin could mandate that all waste be treated at a "materials recovery facility" ("MRF") prior to dumping. Such treatment would eliminate the need for an individual to separate out recyclable materials. Indeed, NSWM notes, the current statute permits generators to use MRFs in lieu of separating out recyclables, but only if the waste generator resides in a community that has adopted an effective recycling program
 
 
 [5]
 See C & A Carbone, Inc. v. Town of Clarkstown, --- U.S. ----, ----, 114 S.Ct. 1677, 1682, 128 L.Ed.2d 399 (1994) ("[W]hat makes garbage a profitable business is not its own worth but the fact that its possessor must pay to get rid of it. In other words, the article of commerce is not so much the solid waste itself, but rather the service of processing and disposing of it."); Fort Gratiot Sanitary Landfill, Inc., 504 U.S. at 359, 112 S.Ct. at 2023 ("Solid waste, even if it has no value, is an article of commerce.") (citing Philadelphia v. New Jersey, 437 U.S. 617, 622-23, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978)); Government Suppliers Consolidating Servs., Inc., 975 F.2d at 1277 ("Garbage is, under the prevailing case law of the Supreme Court, indisputably an article of commerce[.]")
 
 
 [6]
 See Scariano v. Justices of the Supreme Court, 38 F.3d 920, 926 (7th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 2582, 132 L.Ed.2d 831 (1995) (noting that these two approaches govern dormant Commerce Clause analysis)
 
 
 [7]
 See Alliance for Clean Coal, 44 F.3d at 595 (noting that such state statutes are "subject to the strictest scrutiny") (quotation and citation omitted)
 
 
 [8]
 Brown-Forman Distillers Corp., 476 U.S. at 579, 106 S.Ct. at 2084 (noting that "[w]hen a state statute directly regulates ... interstate commerce ... we have generally struck down the statute without further inquiry"); Edgar v. MITE Corp., 457 U.S. 624, 643, 102 S.Ct. 2629, 2641, 73 L.Ed.2d 269 (1982) (plurality op.) ("[A]ny attempt 'directly' to assert extraterritorial jurisdiction over persons or property would offend sister States and exceed the inherent limits of the State's power."); see also Baldwin v. G.A.F. Seelig, Inc., 294 U.S. 511, 521, 55 S.Ct. 497, 499-500, 79 L.Ed. 1032 (1935) ("New York has no power to project its legislation into Vermont by regulating the price to be paid in that state for milk acquired there."); cf. Joseph E. Seagram & Sons, Inc. v. Hostetter, 384 U.S. 35, 43, 86 S.Ct. 1254, 1260, 16 L.Ed.2d 336 (1966) (stating that the "mere fact" that the statute at issue was "geared to appellants' pricing policies in other States [was] not sufficient to invalidate" it, and noting that the case at hand did not present evidence of the statute's extraterritorial effects which could be considered "when a case arises that clearly presents them"), overruled, Healy v. Beer Inst., 491 U.S. 324, 343, 109 S.Ct. 2491, 2503, 105 L.Ed.2d 275 (1989) ("[T]o the extent that Seagram holds that retrospective affirmation statutes do not facially violate the Commerce Clause, it is no longer good law.")
 
 
 [9]
 See also Cotto Waxo Co. v. Williams, 46 F.3d 790, 794 (8th Cir.1995) (stating generally that "a statute has extraterritorial reach when it necessarily requires out-of-state commerce to be conducted according to in-state terms"); Old Bridge Chems., Inc. v. New Jersey Dep't of Envtl. Protection, 965 F.2d 1287, 1293 (3d Cir.) ("The Supreme Court has invalidated state statutes where a state has 'projected' its legislation into other states and directly regulated commerce therein, thereby either forcing individuals to abandon commerce in other states or forcing other states to alter their regulations to conform with the conflicting legislation.") (collecting cases), cert. denied, --- U.S. ----, 113 S.Ct. 602, 121 L.Ed.2d 538 (1992)
 
 
 [10]
 In Cotto Waxo Co. v. Williams, 46 F.3d 790 (8th Cir.1995), the Eighth Circuit treated the issue of whether a state statute had an "extraterritorial reach" as a separate inquiry from the issue of whether the statute discriminated against interstate commerce. In its view, "[i]t may also be correct to say that 'extraterritorial reach' is a special example of 'directly' regulating interstate commerce. The Supreme Court has not clarified this point[.]" Id. at 793 n. 3. The Eighth Circuit took the view that, if a statute has the forbidden extraterritorial effect, it is per se invalid. Id. at 793. A statute that discriminates against interstate commerce is invalid if there is not an important reason for that discrimination
 We have no need to determine whether the issue of extraterritorial reach ought to be analyzed distinctly from the issue of discrimination against interstate commerce because, in any event, as we discuss later in this opinion, Wisconsin can proffer no sufficiently important reason for the statute.
 
 
 [11]
 With respect to NSWM's Sec. 1983 claims, we note that the Supreme Court has held that Commerce Clause violations are cognizable under Sec. 1983. See Dennis v. Higgins, 498 U.S. 439, 446, 451, 111 S.Ct. 865, 870, 872-73, 112 L.Ed.2d 969 (1991); see also Kleenwell Biohazard Waste & Gen. Ecology Consultants v. Nelson, 48 F.3d 391, 393 (9th Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 2580, 132 L.Ed.2d 830 (1995); Waste Sys. Corp. v. County of Martin, 985 F.2d 1381, 1389 (8th Cir.1993). Thus, for the reasons set forth in the text, NSWM is entitled to such relief with respect to its claim concerning the effective recycling program. With respect to NSWM's other claims, the district court's December 15, 1994 summary judgment ruling granted NSWM's motion "as it concerns the rulemaking requirement found in the final sentence of Sec. 159.11(1), Wis.Stats., and the effective siting requirement found at section 159.12(3), Wis.Stats." R.61 at 17. This ruling certainly appears to encompass NSWM's Sec. 1983 claim based on the effective siting and formal rulemaking aspects of Wisconsin's solid waste legislation. However, the district court did not enter judgment with respect to these claims until after the bench trial. The court's December 29, 1994 order, entered following the bench trial, provided that
 judgment be entered that the rulemaking requirement in the final sentence of Sec. 159.11(1), Wis.Stats., and the effective siting requirement found at section 159.12(3), Wis.Stats. violate the Commerce Clause of the United States Constitution and are invalid, and dismissing the remaining claims in plaintiffs' complaint with prejudice
 R.81. The district court erred in dismissing NSWM's Sec. 1983 claim as it related to the "effective siting" and "formal rulemaking" provisions of the Wisconsin statute; its decision that these provisions violated the Commerce Clause entitled NSWM to Sec. 1983 relief. See Higgins, 498 U.S. at 451, 111 S.Ct. at 872-73.