with whom O’SCANNLAIN, CALLAHAN, BEA, IKUTA, and N.R. SMITH, Circuit Judges, join, and with whom MURGUIA, Circuit Judge, joins as to Part III, dissenting from the denial of rehearing en banc:
In upholding California’s ethanol regulations, the 2-1 majority in this case finds at least facially constitutional a protectionist regulatory scheme that threatens to Bal-kanize our national economy. In so doing, the majority disregards longstanding dormant Commerce Clause doctrine, and places the law of this circuit squarely at odds with Supreme Court precedent.
The deleterious effects of California’s scheme on our national economic union are not speculative. The states of Nebraska, Illinois, Iowa, Kansas, Michigan, Missouri, North Dakota, Ohio, and South Dakota *513 (which are major producers of corn and ethanol) filed an amicus brief in support of en banc rehearing.[1] They argue that California’s ethanol regulations “impinge[ ] on the sovereign interests of the Amici States to regulate farming, ethanol production, and other activities within their own borders as they see fit.” These states further observe that California’s regulations “close[] the California border to ethanol produced in Amici States in favor of chemically-identieal ethanol produced within California....” These are the very types of concerns that generated the Supreme Court’s dormant Commerce Clause case law, and the panel majority ignores them.
Our federal system grants states substantial discretion to remedy perceived local problems. But the Constitution sharply constrains their power to do so at the expense of other states. Because the majority opinion nullifies any such limitations, I respectfully dissent from our failure to rehear this case en banc.
I.
In the Global Warming Solutions Act of 2006, California pledged to reduce its greenhouse gas emissions to 1990 levels by the year 2020. To implement this goal, the California Air Resources Board (CARB) promulgated the Low Carbon Fuel Standard (Fuel Standard). The Fuel Standard requires businesses that sell transportation fuels in California to reduce the “carbon intensity” of their fuels by ten percent before 2020. As CARB describes it, “[c]arbon intensity is not an inherent chemical property of a fuel, but rather it is reflective of the process in making, distributing, and using that fuel.”
The Fuel Standard explicitly treats instate and out-of-state ethanol differently in calculating carbon intensity.[2] Indeed, a fuel’s carbon intensity depends in part on the location where it is produced. All else equal, the regulations always assign a higher carbon intensity to Midwestern ethanol than ethanol from California. As such, CARB predicts that the Fuel Standard will soon eliminate Midwestern ethanol from the California market. Further, the regulations sweep beyond the borders of California. Because a fuel’s carbon intensity depends largely on out-of-state production and land use decisions, California’s scheme necessarily affects those processes.
On December 23, 2009, and February 2, 2010, Plaintiffs-Appellees filed suit in the United States District Court for the Eastern District of California, contending that California’s regulations violate the dormant Commerce Clause. Specifically, two groups of Plaintiffs led by the Rocky Mountain Farmers Union (Rocky Mountain) and the American Fuels & Petrochemical Manufacturers Association challenged the Fuel Standard’s ethanol regulations. On December 29, 2011, the district court agreed that the ethanol regulations violate the dormant Commerce Clause, awarded summary judgment on that basis, and granted Rocky Mountain’s motion for a preliminary injunction.
*514 On September 18, 2013, a divided panel of our court reversed and remanded in principal part. According to the majority, the Fuel Standard’s ethanol regulations do not facially discriminate against interstate commerce because California has “good and non-discriminatory reason[s]” for treating out-of-state ethanol differently. Rocky Mountain Farmers Union v. Corey, 730 F.3d 1070, 1107 (9th Cir.2013). The majority further concluded that the regulations do not have extraterritorial reach because they merely provide incentives to out-of-state firms. The majority therefore reversed the judgment of the district court in relevant part, vacated the preliminary injunction, and remanded to the district court for consideration of whether the ethanol regulations “discriminate in purpose or in practical effect.” Id. at 1078. The panel instructed the district court to apply strict scrutiny if it finds that they do, and to apply the balancing test established in Pike v. Bruce Church, Inc., 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), if it determines that they do not. Rocky Mountain Farmers Union, 730 F.3d at 1078. However, the majority made clear that the outcome of this analysis is predestined, instructing the district court that the regulations “incorporate state boundaries for good and nondiscriminatory reason[s].” Id. at 1107.
Judge Murguia concurred in part and dissented in part. While she agreed with the majority in some respects, she disagreed regarding the ethanol regulations. Judge Murguia determined that the ethanol regulations were facially discriminatory, and she concluded that they failed to withstand strict scrutiny because California could attempt to mitigate climate change through non-discriminatory means.
II.
In the name of combating “a new type of harm,” the majority rejects longstanding dormant Commerce Clause precedent as mere “archaic formalism.” Rocky Mountain Farmers Union, 730 F.3d at 1107. I therefore begin with a brief survey of the doctrine, and its critical place in our constitutional order.
“During the first years of our history as an independent confederation, the National Government lacked the power to regulate commerce among the States,” and “each State was free to adopt measures fostering its own local interests without regard to possible prejudice to nonresidents.... ” Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me., 520 U.S. 564, 571, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997). This “conflict of commercial regulations, destructive to the harmony of the States.... was the immediate cause that led to the forming of a [constitutional] convention.” Id. (quoting Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 224, 6 L.Ed. 23 (1824) (Johnson, J., concurring in the judgment)). Thus, as Justice Cardozo observed long ago, the Constitution “was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division.” Baldwin v. G.A.F. Seel-ig, Inc., 294 U.S. 511, 523, 55 S.Ct. 497, 79 L.Ed. 1032 (1935).
To implement the Constitution’s objective of national economic unity, the Supreme Court “has consistently held that the Constitution’s express grant to Congress of the power to ‘regulate Commerce ... among the several States,’ Art. I, § 8, cl. 3, contains ‘a further, negative command, known as the dormant Commerce Clause....’” Am. Trucking Ass’ns v. Mich. Pub. Serv. Comm’n, 545 U.S. 429, 433, 125 S.Ct. 2419, 162 L.Ed.2d 407 (2005) (quoting Okla. Tax Comm’n v. Jefferson Lines, Inc., 514 U.S. 175, 179, 115 S.Ct. *515 1331, 131 L.Ed.2d 261 (1995)).[3] The dormant Commerce Clause promotes economic integration by “significantly limiting] the ability of States and localities to regulate or otherwise burden the flow of interstate commerce.” McBurney v. Young,—U.S.-, 133 S.Ct. 1709, 1719, 185 L.Ed.2d 758 (2013) (quoting Maine v. Taylor, 477 U.S. 181, 151, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986)). “It is driven by a concern about ‘economic protectionism— that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.’ ” McBumey, 133 S.Ct. at 1719 (quoting New Energy Co. of Ind. v. Limbach, 486 U.S. 269, 273-74, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988)).
In upholding California’s sweeping and discriminatory ethanol regulations, the majority brushes aside two foundational tenets of dormant Commerce Clause jurisprudence. First, the majority gives short shrift to the principle that “[sjtate laws that discriminate against interstate commerce face ‘a virtually per se rule of invalidity.’ ” Granholm v. Heald, 544 U.S. 460, 476, 125 S.Ct. 1885, 161 L.Ed.2d 796 (2005) (quoting Philadelphia v. New Jersey, 437 U.S. 617, 624, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978)). Second, the majority abjures the rule that “a state law that has the ‘practical effect’ of regulating commerce occurring wholly outside that State’s borders is invalid.... ” Healy v. Beer Inst., 491 U.S. 324, 332, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989).
Until recently, our circuit faithfully applied these doctrines, striking down parochial state laws that burdened interstate commerce. See, e.g., Birth Hope Adoption Agency, Inc. v. Ariz. Health Care Cost Containment Sys., 218 F.3d 1040, 1044-45 (9th Cir.2000); NCAA v. Miller, 10 F.3d 633, 640 (9th Cir.1993); BFI Med. Waste Sys. v. Whatcom Cnty., 983 F.2d 911, 913 (9th Cir.1993). The majority opinion represents a dramatic and unwarranted change of course.
III.
The majority’s most basic, and perhaps most consequential, error is its contention that California’s regulatory scheme does not facially discriminate against out-of-state commerce. The majority concludes, in essence, that the regulations are not discriminatory on their face because California has “some reason, apart from [its] origin, to treat [out-of-state ethanol] differently.” Rocky Mountain Farmers Union, 730 F.3d at 1089 (quoting Philadelphia, 437 U.S. at 627, 98 S.Ct. 2531, 98 S.Ct. 2531). As Judge Murguia observes in dissent, however, this reasoning “puts the cart before the horse,” and is therefore “inconsistent with Supreme Court precedent.” Rocky Mountain Farmers Union, 730 F.3d at 1108 (Murguia, J., concurring in part and dissenting in part).
Contrary to the majority’s analytical framework, “[determining whether a regulation facially discriminates against interstate commerce begins and ends with the regulation’s plain language.” Id. Under the dormant Commerce Clause, “ ‘discrimination’ simply means differential treat *516 ment of in-state and out-of-state economic interests that benefits the former and burdens the latter.” Or. Waste Sys., Inc. v. Dep’t of Envtl. Quality, 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994). “[T]he purpose of, or justification for, a law has no bearing on whether it is facially discriminatory.” Id. at 100, 114 S.Ct. 1345 (citing Chem. Waste Mgmt., Inc. v. Hunt, 504 U.S. 334, 340—41, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992)).
Further, the language from Philadelphia, 437 U.S. at 627, 98 S.Ct. 2531, on which the majority relies has nothing to do with determining whether a regulation facially discriminates against interstate commerce. Rather, it merely shows that some discriminatory regulations may ultimately survive strict scrutiny. See United Haulers Ass’n v. Oneida-Herkimer Solid Waste Mgmt. Autk, 550 U.S. 330, 366, 127 S.Ct. 1786, 167 L.Ed.2d 655 (2007) (Alito, J., dissenting) (citing quoted passage from Philadelphia as example of applying strict scrutiny). Thus, whether California has good reasons for penalizing Midwestern ethanol simply has nothing to do with whether the state’s regulations are facially discriminatory.
It is clear that the challenged regulations discriminate against interstate commerce. Most blatantly, the Fuel Standard expressly assigns a higher carbon intensity to Midwestern ethanol, based in part on the greenhouse gas emissions arising from its transportation to California. Ethanol produced in-state faces no such penalty. As Judge Murguia notes, the regulatory scheme therefore “differentiates between in-state and out-of-state ethanol, according more preferential treatment to the former at the expense of the latter.” Rocky Mountain Farmers Union, 730 F.3d at 1108 (Murguia, J., concurring in part and dissenting in part). Because ethanol from Midwestern states faces a regulatory burden that chemically identical in-state ethanol does not, California’s regime is facially discriminatory. See Or. Waste, 511 U.S. at 99-100, 114 S.Ct. 1345. In concluding otherwise, the majority contravenes black letter law and renders our dormant Commerce Clause jurisprudence incoherent.
IV.
The majority compounds its error by concluding that legitimate local concerns support California’s regulation of the interstate ethanol market. Because the regulations are facially discriminatory, any justifications for them must “pass the ‘strictest scrutiny.’ ” Id. at 101, 114 S.Ct. 1345 (quoting Hughes v. Oklahoma, 441 U.S. 322, 337, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979)). To withstand this searching review, “the statute must serve a legitimate local purpose, and the purpose must be one that cannot be served as well by available nondiscriminatory means.” Maine, 477 U.S. at 140, 106 S.Ct. 2440. “This is an extremely difficult burden, ‘so heavy that facial discrimination by itself may be a fatal defect.’ ” Camps Newfound, 520 U.S. at 582, 117 S.Ct. 1590 (quoting Or. Waste, 511 U.S. at 101, 114 S.Ct. 1345).
California fails to carry its heavy burden. According to the majority, “[i]f [greenhouse gas] emissions continue to increase, California may see its coastline crumble under rising seas, its labor force imperiled by rising temperatures, and its farms devastated by severe droughts.” Rocky Mountain Farmers Union, 730 F.3d at 1097. When viewed against this backdrop, California’s regulatory justifications appear weighty indeed. But the majority overlooks a critical fact — the Fuel Standard will not remedy the problem. To the contrary, CARB acknowledges that “[greenhouse gas] emission reductions by the [Fuel Standard] alone will not result in significant climate change.” In other *517 words, California admits that its scheme will have little to no effect in averting the environmental catastrophe envisioned by the majority. This concession alone shows that the regulations fail strict scrutiny.[4]
And the defects in California’s ethanol regime go well beyond its ineffectiveness. While the regulations may not slow climate change, they will assuredly promote California’s energy industry at the expense of out-of-state competitors. CARB acknowledges that the Fuel' Standard will “re-duc[e] the volume of transportation fuels that are imported from other states____” As such, CARB expects that the regulations will “keep[] more money in the State,” and that they “will provide needed employment, [and] an increased tax base for the State....” In short, CARB admits that it purposefully “developed the [Fuel Standard] in a manner that minimizes costs and maximizes the total benefits to California.”
Of course, states may pass legislation that benefits local industry. But, “in all but the narrowest circumstances,” they may not do so at the expense of other states. Granholm, 544 U.S. at 472, 125 S.Ct. 1885. In concluding that California’s ethanol regulations are facially neutral in spite of their overt and unjustified discrimination against interstate commerce, the majority departs from settled law and cuts this circuit’s dormant Commerce Clause jurisprudence loose from its moorings.
V.
California’s ethanol regulations suffer from another constitutional defect: they seek to control conduct in other states. The Supreme Court has clearly and eonsis-tently instructed that “a state law that has the ‘practical effect’ of regulating commerce occurring wholly outside that State’s borders is invalid.... ” Healy, 491 U.S. at 382, 109 S.Ct. 2491; see also Baldwin, 294 U.S. at 521-22, 55 S.Ct. 497. And the ethanol regulations plainly have extraterritorial reach, as they seek to influence out-of-state land use decisions and production methods. In concluding otherwise, the majority disregards controlling precedent and departs from the holdings of the Supreme Court and our sister circuits. More fundamentally, the majority approves a regime that threatens the very sort of “economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation.” Granholm, 544 U.S. at 472, 125 S.Ct. 1885 (quoting Hughes, 441 U.S. at 325-26, 99 S.Ct. 1727).
The rule that one state “has no power to project its legislation into” another state, Baldwin, 294 U.S. at 521, 55 S.Ct. 497, is fundamental to our federal system. It embodies “the Constitution’s special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres.” Healy, 491 U.S. at 335-36, 109 S.Ct. 2491 (footnotes omitted). Thus, “the ‘Commerce Clause ... precludes the application of a state statute to commerce that takes place wholly outside of the State’s borders, whether or not the commerce has effects within the State....’” Id. at 336, 109 S.Ct. 2491 (quoting Edgar v. MITE Corp., 457 U.S. 624, 642-43, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982) (plurality opinion)). California’s ethanol regulations fail this test.
*518 It is no answer to assert, as the majority-does, that the Fuel Standard merely provides “incentives” that might influence out-of-state conduct. See Rocky Mountain Farmers Union, 730 F.3d at 1103-04. By penalizing certain out-of-state practices, California’s regulations control out-of-state conduct just as surely as a mandate would, particularly in view of California’s economic clout. Thus, whether California’s scheme is characterized as providing “incentives” or establishing “mandates,” it has the practical effect of regulating interstate commerce. And, under the dormant Commerce Clause, “[t]he critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State.” Healy, 491 U.S. at 336, 109 S.Ct. 2491 (citing Brown-For-man Distillers Corp. v. N.Y. State Liquor Auth, 476 U.S. 573, 579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986)) (emphasis added).[5]
Finally, the majority significantly underestimates the risk that California’s ethanol scheme will spur other states to enact “the kind of competing and interlocking local economic regulation that the Commerce Clause was meant to preclude.” Healy, 491 U.S. at 337, 109 S.Ct. 2491. For example, now that the panel majority has blessed California’s experiment in extraterritorial regulation, Oregon may move forward with its own Clean Fuels Program. The majority assures us that the Oregon program and those of other states will merely “complement!]” California’s, Rocky Mountain Farmers Union, 730 F.3d at 1104, but there is no guarantee that this is so.[6] In any event, ethanol producers will soon face the daunting prospect of navigating several interlocking, if not entirely contradictory, regulatory regimes. Fragmentation of the national economy may ensue.
Two brief examples Alústrate the point. If California may, consistent with the dormant Commerce Clause, seek to influence out-of-state ethanol production, it may just as legitimately seek to influence any out-of-state conduct with perceived local effects. Under the majority’s reasoning, California could impose regulatory penalties (or grant “incentives”) to require manufacturers in Texas to pay higher wages to their employees if they intend to sell their products in California. Such a measure would, of course, benefit California to the extent that it would minimize the risk of competition from Texas businesses, with their lower labor costs. But under the same logic, Texas could — and assuredly would — respond in kind, perhaps by penalizing California agriculture on account of its reliance on costly irrigation methods.
Similarly, California could — under the majority’s reasoning — penalize out-of-state wineries to account for the environmental effects of transporting their wines to California. Like the Fuel Standard, such a *519 regulation would promote California businesses at the expense of out-of-state interests. And, also like the Fuel Standard, such a regulation could lead to destructive interstate retaliation.[7]
The very purpose of the dormant Commerce Clause is to ensure that “[rivalries among the States are ... kept to a minimum, and a proliferation of trade zones is prevented.” Granholm, 544 U.S. at 472, 125 S.Ct. 1885 (citing C & A Carbone, Inc. v. Town of Clarkstown, N.Y., 511 U.S. 383, 390, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994)). Until the majority’s ruling, the dormant Commerce Clause guarded against such economic fragmentation. See Baldwin, 294 U.S. at 524, 55 S.Ct. 497 (explaining that a state may not “condition importation upon proof of a satisfactory wage scale in factory or shop”). Now, the dormant Commerce Clause has been rendered toothless in our circuit, and we stand in open defiance of controlling Supreme Court precedent.
VI.
The majority opinion in this case upholds a regulatory scheme that, on its face, promotes California industry at the expense of out-of-state interests. The majority opinion also sanctions California’s clear attempt to project its authority into other states. Because the Constitution forbids such an expansive and discriminatory exercise of state power over interstate commerce, I respectfully dissent from our failure to rehear this case en banc.

. In his concurrence in the denial of rehearing en banc, Judge Gould notes that 41 states did not join in the amicus brief seeking en banc rehearing. This should be no surprise since one of those states is California, which promulgated the offending regulations, and most of the other states are not major corn or ethanol producers.

. For the sake of brevity, I focus on the majority’s endorsement of California's ethanol regulations. But the panel’s approval of California’s sweeping crude oil regulations also merited en banc review.

. "The 'negative' aspect of the Commerce Clause was considered the more important by the 'father of the Constitution,’ James Madison. In one of his letters, Madison wrote that the Commerce Clause 'grew out of the abuse of the power by the importing States in taxing the non-importing, and was intended as a negative and preventive provision against injustice among the States themselves, rather than as a power to be used for the positive purposes of the General Government.’ ” W. Lynn Creamery, Inc. v. Healy, 512 U.S. 186, 193 n. 9, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994) (quoting 3 M. Farrand, Records of the Federal Convention of 1787, at 478 (1911)).

. As Judge Murguia observes in dissent, the ethanol regulations also fail strict scrutiny because California could endeavor to reduce greenhouse gas emissions through non-discriminatory means. California could, for instance, "treat[] ethanol produced in efficient plants more favorably than ethanol from inefficient plantsRocky Mountain Farmers Union, 730 F.3d at 1109 (Murguia, J., concurring in part and dissenting in part).

. Other courts of appeals have correctly held that Commerce Clause analysis turns on a law's practical consequences, not on semantics. See, e.g., Nat’l Foreign Trade Council v. Natsios, 181 F.3d 38, 69 (1st Cir.1999), aff'd sub nom. Crosby v. Nat’l Foreign Trade Council, 530 U.S. 363, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000); Nat’l Solid Wastes Mgmt. Ass’n v. Meyer, 63 F.3d 652, 661-62 (7th Cir.1995).

. California recently pledged to align its energy policies with Oregon, Washington, and British Columbia. Michael Wines, Climate Pact Is Signed by 3 States and Partner, N.Y. Times, Oct. 30, 2013, at A18. If, as the majority holds, the Constitution poses no obstacle to California's regulation of interstate commerce, there is little reason to doubt that California may regulate foreign commerce as well. Unsurprisingly, this conclusion puts us squarely at odds with our sister circuits. See Natsios, 181 F.3d at 69. Further, the grouping of states in this fashion represents the type of “economic Balkanization” that the Commerce Clause was intended to prevent. Hughes, 441 U.S. at 325, 99 S.Ct. 1727.

. In his concurrence in the denial of rehearing en banc, Judge Gould relies on Pharmaceutical Research & Manufacturers of America v. Walsh, 538 U.S. 644, 669, 123 S.Ct. 1855, 155 L.Ed.2d 889 (2003), for the proposition that California may legitimately regulate instate commerce with the goal of influencing out-of-state conduct. But nothing in Walsh repudiates the principle that a state may not close its borders to out-of-state goods unless exporters alter their out-of-state conduct. See Baldwin, 294 U.S. at 524, 55 S.Ct. 497.